IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 11, 2004 Session

IN THE MATTER OF: D.C. AND S.C., STATE OF TENNESSEE
DEPARTMENT OF CHILDREN'S SERVICES v. KAREN CAREY, ET AL.

A Direct Appeal from the Juvenile Court for Benton County
No. 3007    The Honorable Clyde W. Watson, Judge

No. W2004-00472-COA-R3-PT - Filed November 3, 2004

This is a termination of parental rights case. Mother appeals from the order of the Juvenile Court of Benton County, terminating her parental rights on the grounds of persistence of conditions. Specifically, Mother asserts that the trial court erred in admitting evidence of an event that occurred after the Petition to Terminate had been filed, that the termination of her parental rights is not supported by clear and convincing evidence in the record, and that termination is not in the best interest of the children. We reverse and remand.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Jason W. Pearcy, Camden, For Appellant, Karen Carey

Paul G. Summers, Attorney General and Reporter; Julie Randall Pablo, Assistant Attorney General, For Appellee, Tennessee Department of Children's Services

OPINION

Karen Carey ("Carey,""Mother," or "Appellant") is the mother of the two minor children at issue in this case, D.C. (d.o.b. 5/8/91) and S.C. (d.o.b. 9/29/92). The natural father of D.C. and S.C. is Frank Carey.[1]

---

[1] On April 28, 2004, a Default Judgment was entered against Frank Carey, terminating his parental rights. He is not a party to this appeal.

On November 5, 2001, the Department of Children's Services ("DCS," or "Appellee") filed a "Petition for Temporary Custody," based upon the following information:

> ...[I]t has been reported that the mother of the children, Karen Carey, is an alcoholic and beats the children when she is drunk. The children have stated that their mother drinks all the time, becomes belligerent when she is drunk, and physically abuses them. [D.C.] has reported that her mother has attempted to choke her and hits her with her fists. The children report that there are often men in the house when their mother drinks and later passes out. Both children have made statements that indicate possible sexual abuse by these men. It has been reported that these children roam the neighborhood when their mother is passed out and, on one occasion, a neighbor found [S.C.] on Interstate 40 attempting to hitchhike. The home had cockroaches, bags of garbage throughout, and an outdoor toilet inside the house. Karen Carey does not have a job at this time, having been terminated from her last job for being drunk at work. There have been several arrangements made to help Karen Carey enter treatment, but she has refused to enter treatment.

A "Protective Custody Order" was entered that same day, placing the children in the temporary custody of their aunt, Rosemary Strickland. At a November 6, 2001 hearing, the trial court found probable cause of dependency and neglect due to alcohol use, physical abuse, and lack of supervision on the part of Carey and entered an "Interim Order" on December 31, 2001, by which the children were to remain in Ms. Strickland's custody and counsel was appointed for Carey. At a December 18, 2001 hearing, Carey agreed to have custody remain with Ms. Strickland. She further agreed to participate in an inpatient treatment program and to attend AA meetings, parenting classes, and anger management counseling. These requirements were set out in the trial court's Order of February 12, 2002. Additionally, the Order required Carey to have a stable home, seek employment, pay support after procuring a job, and remain sober.

The parties returned to court on April 9, 2002. At that time, the trial court found that Carey had not remained sober. By Order of June 18, 2002, overnight visitation was suspended, supervised visitation was reinstated, Carey was ordered to avoid contact with any users of alcohol, to submit to random alcohol screens three times per month, and to continue working on the goals set forth in the previous orders. Following a July 16, 2002 hearing, the trial court entered an Order on September 17, 2002 allowing Carey unsupervised visitation with the children once per week, and reiterating that Carey was to comply with all requirements contained in previous orders. Following a hearing, on October 8, 2002, custody of the children was given to DCS and Carey was ordered to pay child support in the amount of $53.00 per week.

On October 24, 2002, Permanency Plans were entered for both the children. The Permanency Plans were signed by Carey and incorporated all of the requirements that Carey was ordered to

complete in the trial court's previous orders. A Quarterly Review was conducted on November 19, 2002 and it was noted that no progress had been made toward reducing risks that necessitate continued foster care. Additional reviews were conducted on April 15, 2003 and November 16, 2003. At both of these subsequent reviews, it was noted that Carey had made no progress toward reducing the risks that necessitated removal of her children.

On December 4, 2002, Carey was arrested in Benton County for her third DUI.[2] According to the record, the children were in the vehicle with her at the time. Carey pled guilty to this offense and was sentenced to eleven months and twenty-nine days in jail. All but one-hundred twenty days were suspended.

A hearing was held on December 10, 2002, at which the Permanency Plans were approved by the trial court and the children were found to be dependent and neglected due to Carey's noncompliance with several previous court orders and because Carey was scheduled to begin her jail sentence on December 11, 2002. An Order to this effect was entered on February 18, 2003.

On September 29, 2003, DCS filed a "Petition to Terminate Parental Rights" (the "Petition") DCS asserted numerous grounds, including Carey's willful failure to obey the trial court's orders, willful abandonment based on failure to provide more than token support, showing a wanton disregard for the welfare of the children, failure to maintain suitable housing, despite DCS' reasonable efforts to assist, failure to substantially comply with the Permanency Plans, and persistence of conditions. A Guardian Ad Litem was appointed by Order of November 13, 2003. Carey answered the Petition on November 14, 2003.

On October 21, 2003, Carey was arrested in Benton County for her fourth DUI offense. At the time of the hearing in this case, Carey's criminal case was still pending.

This matter was heard by the trial court on November 17, 2003. An "Order Terminating Parental Rights and Decree of Guardianship" (the "Final Order") was entered on January 12, 2004. The Final Order reads, in pertinent part, as follows:

> [T]he Court finds upon clear and convincing evidence that the Petition To Terminate Parental Rights filed by the State of Tennessee, Department of Children's Services, is well taken as to Respondent, Karen Carey, and should be sustained and relief granted thereunder for the causes therein stated, and the Court makes the following findings of fact and conclusions of law.
>
> Regarding the requirements in the permanency plan that Ms. Carey will have another alcohol and drug assessment, will comply

_____

[2] Carey's first DUI was on July 19, 1993 in Hickman County. Her second offense was on February 2, 2000 in Benton County.

with its recommendations, including attending short term or long term in-house treatment if recommended, and attend AA meetings once per week, Ms. Carey did have another assessment in October 2003. There was testimony presented that recently Ms. Carey has not substantially attended AA meetings and that she did not find the meetings worth attending. The plan requires that counseling include sessions on anger management, parenting, learning to communicate without making threats, and random alcohol screens. Ms. Carey signed release forms and participated in a parenting class in October 2003. There were alcohol screens done which were not positive, but she did not submit to the blood alcohol test following her arrest on charges of fourth offense DUI. The plan requires that Ms. Carey will learn to understand the dangers of exposing the girls to people who are drinking excessively, and the Court is unsure that she complied with that in any way. The plan requires that Ms. Carey provide information regarding the father of the children, which she has done. The Court finds that Ms. Carey did comply with several of the tasks in the permanency plan.

However, the Court finds that Ms. Carey has not been completely truthful to the Court. Ms. Carey testified that she has had nothing to drink for two years. However, the officer testified that, at the time of her most recent arrest she smelled of alcohol, that she staggered when she walked, she had slurred speech, and she refused to submit to the blood alcohol test.

The Guardian Ad Litem, John Whitworth, pointed out what the Court finds is the most important issue in this case, that the children were taken from Ms. Carey because she was endangering the children with her alcohol and/or drug use. The Guardian Ad Litem pointed out that after the children had been removed from the home approximately one year, the children were allowed to return for a period of visitation. Ms. Carey had the children in the vehicle with her when she was arrested and convicted of a third offense of driving under the influence. Ms. Carey says that it was due to the prescription drugs that she was using, but the Court has some question after hearing all the testimony and hearing from the girls as to whether or not that was true. Now she has a pending fourth offense DUI and Driving on a Revoked License.

The case worker has testified that when she talked with Ms. Carey to try to help her and to tell her what she needed to do, she was argumentative. The case worker testified that Ms. Carey refused to

listen. The Court finds that Ms. Carey did not absorb anything the case worker was trying to tell her.

Obviously the children have been removed from the home of the parent by order of this Court for a period of six (6) months; a condition which led to the children's removal still persists, which in all reasonable probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's safe return to the care of Karen Carey; there is little likelihood that these conditions will be remedied at an early date so that these children can be returned safely to Karen Carey in the near future; and the continuation of the legal parent and child relationship greatly diminishes the children's chances to return to a safe and stable permanent home.

The Court finds that [DC] and [SC] are obviously outgoing and very intelligent. They deserve a chance in life.

The Court finds by clear and convincing evidence that it is also in the best interest of the children, . . . for reasons stated above, that the parental rights of Karen Carey to the children be forever terminated and that custody, control, and partial guardianship of the children be awarded to the State of Tennessee, Department of Children's Services, with the right to place the children for adoption and to consent to such adoption in loco parentis ....

The Court finds that the Department of Children's Services has exercised reasonable efforts to prevent removal and reunify the family.

\*     \*     \*

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:

\*     \*     \*

2. That all parental rights of Karen Carey, to the children, . . . are hereby forever terminated; that the complete custody, control, and partial [sic] guardianship of said children is hereby awarded to the State of Tennessee, Department of Children's Services, with the right to place the children for adoption and consent to such adoption in loco parentis....

Carey appeals and raises three issues as stated in her brief:

> 1. Whether the trial court erroneously terminated the Appellant's parental rights based on "persistence of conditions."
>
> 2. Whether the trial court erroneously admitted evidence that occurred after D.C.S. had filed the Petition to Terminate the Appellant's Parental Rights.
>
> 3. Whether the trial court erroneously held that it was in D.C. and S.C.'s best interest to terminate their mother's parental rights.

Since this case was tried by the court sitting without a jury, we review the trial court's factual findings *de novo* accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Campbell v. Fla. Steel Corp*., 919 S.W.2d 26, 35 (Tenn.1996). The trial court's legal conclusions are reviewed *de novo* with no presumption of correctness. *Campbell*, 919 S.W.2d at 35. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the manner and demeanor of the witnesses as they testify, is in a far better position than an appellate court to determine credibility. *McCaleb v. Saturn Corp*., 910 S.W.2d 412, 415 (Tenn.1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). Therefore, the weight, faith, and credit to be given to any witness' testimony will be given great weight by the appellate court. *In re Estate of Walton v. Young*, 950 S .W.2d 956, 959 (Tenn.1997); *Whitaker*, 957 S.W.2d at 837.

The standard for the termination of parental rights is well settled. The United States Supreme Court has recognized the important nature of cases involving the termination of parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745 (1982) (Rehnquist, J., dissenting)). Accordingly, "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id*. The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995) (rev'd on other grounds, *In re: Swanson*, 2 S.W.3d 180 (Tenn.1999)).

As a safeguard, courts are required to apply the heightened "clear and convincing" proof standard. *See Santosky*, 455 U.S. at 769; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* Tenn.Code Ann. § 36-1-113(c)(1) (Supp.2003); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn.Ct.App.1996). Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App.1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App.1992). In order to be clear

and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App.1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn.1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App.1981); *Brandon v. Wright*, 838 S.W.2d at 536.

As a threshold matter, we will first address Appellant's second issue, concerning the trial court's admission of evidence surrounding Carey's arrest for the fourth DUI on October 21, 2003. Carey argues that this evidence should have been excluded since it arose after the Petition was filed on September 29, 2003. It is well settled that the trial court is afforded wide discretion in the admission or rejection of evidence, and the trial court's action will be reversed on appeal only when there is a showing of an abuse of discretion. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn.1992). The paramount concerns in a child custody case are the welfare and best interest of the child. *See Whitaker v. Whitaker*, 957 S.W.2d 837, 837 (Tenn. Ct. App. 1997). It is, therefore, incumbent upon the court to admit all evidence that is relevant to that inquiry. Because of the grave and special nature of termination proceedings, no relevant evidence should be excluded. Here, the testimony of Officer Bolan is relevant as it goes directly to the question of Carey's continued drinking, which is at the heart of this termination proceeding. It is true that Carey is constitutionally cloaked with a presumption of innocence on this fourth DUI charge until such time as the matter is adjudicated in the criminal court; however, when faced with Carey's objection at the hearing, the trial court gave the following explanation for allowing the evidence:

> ...I'm going to allow [Officer Bolan] to testify concerning any personal knowledge he has of your client [Carey]. Again, we're not looking for guilt or innocence in the case, but he has a right to tell the Court any information that he has concerning things that he may have seen your client do involving [the] termination of her parental rights to these children.

The trial court was correct in its assessment and, consequently, did not abuse its discretion in allowing testimony concerning the fourth DUI.

Termination of Parental Rights

T.C.A. § 36-1-113(c)(Supp. 2003) governs termination of parental rights and requires that such termination be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination [of] parental or guardianship rights have been established; and
(2) That termination of the parent's or guardian's rights is in the best interest of the child.

The trial court terminated Carey's parental rights on the ground of persistence of conditions, which is codified at T.C.A. § 36-1-113(g)(3)(A)(Supp.2003):

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

As noted above, the trial court based its decision to terminate Carey's parental rights upon a finding that she continued to drink excessively and to make unwise choices when she was under the influence. The record indicates that Carey has completed two, twelve-week alcohol and drug treatment programs. At the time of the hearing, Carey had found a job and had maintained her employment for over seven months. DCS' witness, Corene Gossage, Carey's neighbor, testified that she had been in Carey's home and that, to her knowledge, there was no alcohol present. In addition, Ms. Gossage had attended neighborhood parties where there was drinking and had not seen Carey there. Furthermore, Belinda Dickinson, an employee of Carey Counseling, testified that Carey, pursuant to the Permanency Plans, had submitted to an alcohol and drug assessment. On October 17, 2003, Ms. Dickinson sent a letter to DCS, which reads, in relevant part, as follows:[ex 11]

Dear Ms. Prather:

The following report concerns an Alcohol and Drug Evaluation completed on Karen Carey by the undersigned on October 17, 2003. This evaluation consisted of the administration of the Substance Abuse Screening Inventory, Version 3 (SASSI-3). The time period covered by this inventory was for the past six months.

The SASSI-3 is a self-report, standardized screening instrument designed to identify respondents who have a high probability of having a Substance Dependence Disorder. The SASSI-3 identifies respondents as having a Substance Dependence Disorder, even if those respondents do not openly acknowledge a problem with substance misuse, or deliberately attempt to conceal such a problem. Research has demonstrated the SASSI-3 correctly identifies 93% of respondents who do not have a Substance Dependence Disorder. Ms. Carey's profile on the SASSI-3 indicates a *"Low Probability of having a Substance Dependence Disorder."* However, Ms. Carey's *defensiveness score* is relatively high, it is not significantly high enough to indicate denial or an attempt to conceal a Substance Dependence Disorder.

According to Ms. Carey, she denies use of alcohol in the past six months. Due to the results of the SASSI-3, it is my recommendation that Ms. Carey *not* be required to participate in Alcohol/Drug treatment....

We concede that Ms. Dickson's opinion letter is not completely dispositive in that the SASSI-3 assessment does not account for the fact that a person may abuse alcohol from time to time without being dependent upon it. However, it does create some doubt as to the correctness of the trial court's conclusion about Carey's continued relationship with alcohol.

The most troubling evidence in this record is clearly Carey's third conviction for DUI and her fourth arrest for the same offense. Concerning the third DUI, Carey testified that she was not under the influence of alcohol but, rather, had taken prescription medication for a leg injury. Although the trial court did not give credence to Carey's testimony, if the issue here is her abuse of alcohol and she was not abusing alcohol but was under the influence of a prescribed medication, then, applying the clear and convincing standard, that creates some question in this Court's mind as to whether the third DUI evinces a continued abuse of *alcohol*.[3] There was also testimony that the children were in the truck with Carey when she was cited for this third DUI; however, there is no indication in the record that Carey was charged with child endangerment in relation to this event.

Concerning the arrest for the fourth DUI, Officer Bolan testified that the vehicle Carey was occupying was experiencing engine trouble and was not actually moving at the time he and his partner stopped to offer an assist. He also testified that Carey failed three field sobriety tests, which were videotaped. Officer Bolan testified that it was his partner, Officer Flowers, who conduct the sobriety tests. Officer Flowers did not testify, nor was the videotape admitted into evidence. Carey

---

[3] T.C.A. §55-10-401, under which Carey was charged, indicates that an intoxicant may include either alcohol or drug or both.

did not submit to a blood test and, at the time of the hearing, she had not been convicted of this offense.

From all of the evidence in this record, it is clear to us that Carey has been guilty at times of poor parenting and bad judgment. We do not condone her conduct; however, we must follow the dictates of the legislature in making our ruling in this case. Therefore, we respectfully disagree that there is clear and convincing evidence that grounds exist for termination in this case under T.C.A. § 36-1-113(g)(3)(A).

Furthermore, at the time of the hearing, D.C. was twelve years old and S.C. was eleven years old. As the trial court pointed out, they appeared to be "outgoing and very intelligent." In terms of what is in the best interest of these children, it is not clear from the children's own testimony, or from the record as a whole, that termination of Carey's parental rights is the best choice here. Although we concede that the bond between this mother and her children is not the strongest, D.C. and S.C's respective testimony indicates that each is not completely at ease with the prospect of not seeing their mother:

> Q. Of course, you [D.C.] might not get to see your mom again until 18 and you get out of high school. Do you understand that?
>
> A. Yes.
>
> Q. Taking that all into consideration, would you like to keep visiting with your mom?
>
> A. I guess.

S.C. testified likewise as follows:

> Q. ...[S.C.], do you understand what I was telling your sister about this might be the last time you get to see your mom?
>
> A. Yes, sir.
>
> Q. The Judge is sitting here and he's going to listen to what ya'll say. What are you telling the Judge to do? That you don't want to see your mom any more or you'd still like to see her just even if it had to be at McDonald's or the park or something like that? What do you want to do?
>
> A. I guess so at the park or something.

-10-

Q. So you'd like to keep the visits going?  Maybe not move in with her but do the visits?

A. Maybe visit or something.

In addition to the children's testimony, the record supports the trial court's conclusion that Carey has made substantial steps in complying with the Permanency Plans.  Carey has maintained a job for at least seven months.  She pays a substantial portion of her income in child support.  She exercises her visitation rights with the children and often gives them money and small gifts at these visits.  She has been able to procure more adequate housing and has attended counseling.  From the testimony of the DCS case worker and from Carey's testimony and her actions, it is apparent that she cares about these children.  In addition, the children's foster parent  testified that she and her husband have no present intention to adopt D.C. and S.C.  This testimony, coupled with the fact that D.C. and S.C. are now teenagers, does not bode well for their chances of being adopted in the near future.

For the foregoing reasons, we find that the evidence before us does not assuage this Court of its doubts about the correctness of the trial court's conclusion that Carey continues to abuse alcohol or that such abuse makes her an unfit mother to these children, especially in light of the progress Carey has made and the fact that there are no adoptive parents waiting in the wings.  Applying the clear and convincing standard, we  reverse the Order of the trial court, terminating the parental rights of Carey.  We remand the case for such further proceedings as may be necessary, including determination of visitation and custody.  Costs of this appeal are assessed against the Appellee, State of Tennessee Department of Children's Services.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.